UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    Case Number: 3:21-Cr-36-MMH-JBT

DAWSON LADALE CREWS

_____

## SENTENCING MEMORANDUM[1]

The Defendant, **DAWSON LADALE CREWS**, requests that the Court impose the statutorily required minimum mandatory sentence in this case.

15 years X 12 months = 180 months

15 years X 52 weeks = 780 weeks

15 years X 365 days = 5475 days

Mr. Crews will stand before this Court for sentencing when he is only 24 years old.[2] He will be facing a term of incarceration of 15 years, with an advisory guidelines range above the minimum mandatory. A sentence within the guidelines range would very nearly represents his entire life up until this point.

### MR. CREWS'S BACKGROUND

---

[1] As part of this sentencing memo, the undersigned intends to submit a short video presentation (approximately 5 minutes long). A copy of the video is being provided to the court and to Ms. Karase, along with the filing of this memo.

[2] Mr. Crews has written a letter to the Court, expressing his regrets for his conduct.

1

Looking at Mr. Crews's background, it is not difficult to understand how he has ended up standing before this court at this point in his life facing such a significant sentence: absent biological father, broken home, substance abuse, physical disability, and mental health issues have all put Mr. Crews at a disadvantage in life. In spite of these struggles, he continues to have support from his mother and other community members.[3]

In 1998, in Gainesville, Florida, Dawson Crews was born. His mother is Charity Crews, who was twenty-two years old at the time of his birth. Ms. Crews reported that she did use marijuana and drank alcohol early in her pregnancy. She also smoked cigarettes while carrying Dawson. And Ms. Crews reported that she suffered from a later substance abuse addiction, including ecstasy and cocaine.

Dawson's biological father is Christie Ray Griffis, who was twenty years or more older than Charity. According to Ms. Crews, she worked with him at a restaurant and one day Mr. Griffis asked Ms. Crews to go for a ride and she did. Ms. Crews reported that Mr. Griffis took her down a dark dirt road and told her "to put up or get out of the car". As a result, Ms. Crews became pregnant with Dawson. Ms. Crews resided with her parents Joseph and Debra Crews during her pregnancy and has lived there most of Dawson's life

---

[3] Letters of Support are attached to this memo as exhibit 2.

2

Mr. Griffis is now 61 years old and has had no contact with Dawson.[4] Perhaps it is better that he was an absent father: he has a criminal record, with cases ranging from worthless checks to arson and reckless display of a firearm.

Dawson Crews struggled from day one: he was born premature by emergency c-section because his umbilical cord was wrapped four times around his neck. He was diagnosed as failure to thrive and was in the hospital for two weeks. He had an extra thumb on one hand that had to be removed when he was a toddler. He had an infection at age two which also required him to be hospitalized. He suffered from a medical condition and he had to have surgery at age five.

Ms. Crews got married to Devin Tieken when Dawson was two years old. Dawson believed Mr. Tieken was his father until the age of seven, when a cousin blurted out the truth. This was very traumatic to Dawson.

Ms. Crews and Mr. Tieken share a son in common, Seth Tieken. Mr. Tieken always treated the boys differently, loving on Seth and ignoring Dawson. When Mr. Tieken disciplined Dawson, his punishment was far harsher than punishment for his brother.

---

[4] At some point, Mr. Crews learned that he had a paternal half-sister. He had some telephone and on-line communications with her but they have lost touch over the last few years.

As he grew, he was picked on at school due to his small frame, acne, poverty, intellectual disability, speech impairment and poor vision. He did not do well in school. He did not read or write well, and he did not understand classes as well as others. During his time in school, Mr. Crews was often bullied. Kids who are bullied can experience negative physical, social, emotional, academic, and mental health issues. Kids who are bullied are more likely to experience depression and anxiety, increased feelings of sadness and loneliness, poor self-esteem, changes in sleep and eating patterns, and loss of interest in activities they used to enjoy.[5]

Mr. Crews's slight physical frame and his intellectual limitations have led him to hang out with younger kids his whole life. His family described times when he would not spend time with the cousins who were his own age, but he would go towards the younger cousins. Not that he was seeking to prey on them: he just felt more comfortable, was able to relate to them, and was accepted by them. Ms. Mary Johnson was employed by the Starke Park and Recreations Department, where she oversaw summer camp programs. During that time, Mr. Crews enrolled and attended activities with other kids. She stated in her letter that she often observed Dawson sitting by himself and playing by himself in the sandbox. She stated that Dawson was immature for

---

[5] https://www.stopbullying.gov/bullying/effects, last accessed June 21, 2022.

his age, was socially awkward around children his age and he often became a target for bullying. He would gravitate to adults, where he felt safe.[6]

On November 2, 2012, Dawson's grandmother Debra Crews died from pneumonia. Dawson and his grandmother were very close. She used to babysit Dawson. Dawson's behavior changed significantly when his grandmother died. Ms. Crews reported that she was basically begging Dawson to take a bath. He completely stopped caring about himself.

While growing up Mr. Crews was exposed to chronic substance and alcohol abuse disorder and mental illness within his home. In fact, Mr. Crews's grandmother, his primary caretaker, suffered from both alcoholism and depression. Research has shown that children exposed within the home with a substance abuse disorder were found to be of lower socioeconomic status and had more difficulties in academic, social, and family functioning when compared with children of parents who do not. These children are also more likely to have higher rates of mental and behavioral disorders. Children exposed to a parent/caretaker with substance abuse disorders are more likely to develop substance abuse disorder symptoms themselves. And this leads to children feeling emotionally and physically neglected.[7]

---

[6] Ms. Johnson's letter is within the letters of support.
[7] Lipari, R.N. and Van Horn, S.L. *Children living with parents who have a substance use disorder.* The CBHSQ Report: August 24, 2017. Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration, Rockville, MD.
https://www.samhsa.gov/data/sites/default/files/report_3223/ShortReport-3223.html

School records indicate that Dawson was assigned to an Individualized Educational Program very early in his schooling.[8] However, even the more intensive focus and smaller classes did not help him with school. He was significantly below achievement levels on the Florida standardized tests. For example, on the third grade results, Dawson was tested for "main idea / purpose" in reading comprehension. Out of 22 points on the test, he only received 12 points and was overall below grade level. By fifth grade, he was falling even further behind: receiving only 9 out of 22 points and scoring ubstantially below grade level. The trend continued through the remainder of the test results. Eventually, he left school to help take care of his grandfather after he fell ill. Although Mr. Crews claimed plans to go into the military or to get a CDL, he never received his GED.

Ultimately, Mr. Crews applied for Social Security disability and was diagnosed with an Intellectual disability, Bipolar- disorder with depressed episodes, Anxiety- Disorder, and poor vision. Mr. Crews does not drive and he has never had a driver's license. He is prone to lapse in judgement and he needs constant reminders to complete daily tasks. Mr. Crews cannot maintain employment due to his inability to keep up with work standards.

---

[8] A portion of his educational records are attached as exhibit 3.

When the Social Security Administration determined his disability, he was found to be fully disabled.[9]

| IMPAIRMENT | PRIORITY | SEVERITY |
|---|---|---|
| 3690 – Low Vision | Other | Severe |
| 3180 – Intellectual Disorder | Primary | Severe |
| 3000 – Anxiety and Obsessive-Compulsive Disorders | Other | Severe |
| 2960 – Depressive, Bipolar and Related Disorders | Secondary | Severe |

This determination was made in June 2019, well before the offense in this case. Thus, his mental health issues are not late developing excuses or justifications for his actions.

Social Security's conclusion is consistent with these court proceedings too. At the beginning of the case, Mr. Crews was referred to Dr. Alan Harris for a competency evaluation. Dr. Harris concluded that "although the defendant is suffering from a severe mental disease or defect, namely bipolar disorder complicated by substance dependency, he is stable at the present time and the condition does not result in mental incompetency."

The undersigned also had Mr. Crews undergo an evaluation with Dr. Jennifer Rohrer.[10] Dr. Rohrer characterizes Mr. Crews's psychiatric history and possible diagnoses as "complicated." However, she does conclude that he suffers from borderline intellectual functioning, substance use disorders, and

---

[9] The Social Security Determination and Evaluation conducted by Emery Milne Psychological Group are attached to this memo as Exhibit 4.
[10] Dr. Rohrer's report is attached as Exhibit 5.

unspecified personality disorder. Mr. Crews, during the consultation, was quite frank about his prior drug use, which indicates that he is open to counseling and therapy.

### NATURE AND CIRCUMSTANCES OF THE OFFENSE

It is clear that Congress has viewed this offense as very serious: it calls for a 15-year minimum incarceration sentence and a term of supervised release that could go all the way to lifetime supervision.

Mr. Crews has never denied the offense, nor its seriousness. When he was first questioned by agents, he was actually in custody on the offense described in paragraph 41. Even though he had an attorney and had every right to decline questioning, he talked with the agents for quite a while and admitted everything regarding the offense. He entered a plea in this case, knowing that he would face a substantial period of time, in order to accept responsibility and not require any victims to be in court.

As a result of the first conviction, a misdemeanor offense, Mr. Crews was required to attend counseling at ITM group. He underwent the court-ordered evaluation on January 23, 2019, and was required to attend weekly counseling sessions. These 90-minutes sessions were Wednesday afternoons at 3:30 p.m. Since Mr. Crews does not drive, he needed to rely on family to take him to and

from the sessions.[11] He attended this counseling from January 30, 2019, until his arrest on October 1, 2019. He attended 26 sessions.[12]

One concern the government may have is the number of cases for Mr. Crews. However, the charges in paragraphs 40, 41, and the instant case happened from March 2020 to July 2020, when he was only 22 years old. They also occurred after he was terminated from his counseling.

### PURPOSES OF SENTENCING

*1.   Punishment, Seriousness of the Offense, Promoting Respect for the Law*

Fifteen years is a long time in custody. Every day in custody, Mr. Crews is under the control of the guards and other authorities at the Bureau of Prisons. He will be told what to wear, where to sleep, when to sleep, when to eat, what to eat, and what type of work to do. If he is given an institution work assignment, like food service, groundskeeper, or laundry, he will earn $.12 to $.40 per hour. He will be given some access to phone and email contact with his family, but all such contact will be monitored. He will have no space that is totally his own.

---

[11] Mr. Crews and his family live on a side street, off US 301 in Lawtey. To get to the counseling requires a drive of almost 7 miles to Starke. There is no public transportation available to get from Lawtey to Startke.
[12] The ITM attendance sheet is attached as Exhibit 6. COM is the abbreviation for attended, NSU is no-show unexcused, and NSE is no-show excused. Mr. Crews had only 6 unexcused absences before his October 1, 2019 VOP arrest. After October 1, 2019, he was detained and unable to attend the sessions.

It is difficult to image the changes that will occur in the next 15 years. Mr. Crews will miss them all, instead being confined in the Bureau of Prisons.

Additionally, any sentence of imprisonment is dangerous. However, an inmate like Mr. Crews (youthful, small-framed, and charged with a sex offense) will be at heightened risk. According to the BOP's website, "The Bureau recognizes sex offenders as a vulnerable population within a prison setting."[13] In spite of this recognition, there are only nine facilities in the entire BOP system offering sex offender treatment programs.[14]

### 2.  *Deterrence & Protecting the Public*

The federal prosecution of Mr. Crews sends a message to him and to the community at large about the seriousness of these kinds of offenses. The combination of the incarceration sentence and supervised release will mean that Mr. Crews is under the court's control for at least the next 20 years.

### 3.  *Correctional Treatment*

It is generally not appropriate for the Court to impose or lengthen a term of incarceration in order to provide rehabilitation or treatment. See 18 U.S.C. §3582, 28 U.S.C. §994(k), and *Tapia v. United States*, 131 S.Ct. 2382 (2011). And although the Court can make recommendations to the BOP regarding

---

[13] https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp, last accessed June 21, 2022.
[14] *Id.*, FCM Carswell (a women's facility), FMC Devens, FCI Elkton, FCI Englewood, FCI Marianna, USP Marion, FCI Petersburg Medium, FCI Seagoville, and USP Tuscon.

placement or programming, only the BOP makes the final determinations for where Mr. Crews will be placed or what programming to offer.

It is clear and Mr. Crews desires and needs mental health counseling and substance abuse counseling.[15] However, since the court can only recommend placement to the BOP, only the BOP will decide Mr. Crews's programing. An earlier start to supervised release will mean that Mr. Crews is under the Court's direct review to ensure compliance with sex offender registration, counseling, and all other conditions.

WHEREFORE, Mr. Crews is asking the Court, not for forgiveness, but for a sentence at the minimum mandatory.

Dated: June 22, 2022.

                                                A. FITZGERALD HALL
                                              FEDERAL DEFENDER, MDFL

                                              s/ Lisa Call
                                              Lisa Call, Assistant Federal Defender
                                              Florida Bar No. 0896144
                                              Assistant Federal Defender
                                              200 West Forsyth Street, Suite 1240
                                              Jacksonville, FL 32202
                                              Telephone: (904) 232-3039
                                              Fax: (904) 232-1937
                                              Email: lisa_call@fd.org

---

[15] Even Dr Harris concluded that regardless of the disposition of this case both mental health and substance abuse treatment are strongly recommended.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic notification to, Kelly Karase, Assistant United States Attorney, 300 N. Hogan St, Suite 700, Jacksonville, Florida 32202, on June 22, 2022.

                                              s/ Lisa Call
                                              Lisa Call, Esq.
                                              Assistant Federal Defender